

FILED
JAMES BONINI
CLERK

06 FEB -3 AM 10: 58

**UNITED STATES DISTRICT COURT**
U.S. DISTRICT COURT
**SOUTHERN DISTRICT OF OHIO** SOUTHERN DIST. OHIO
**EASTERN DIVISION** EAST. DIV. COLUMBUS

|  |  |
|---|---|
| **INGRID MARINO**<br>**629 Oak Street #B**<br>**Columbus, OH 43215-3910** | : Case No. C2 06 85 |
|  | : **JUDGE MARBLEY** |
| **Plaintiff** | : |
|  | : **MAGISTRATE JUDGE KEMP** |
|  | : |
| **v.** | : **COMPLAINT FOR DAMAGES** |
|  | : |
| **BOARD OF TRUSTEES OF THE COLUMBUS** | : |
| **METROPOLITAN LIBRARY** | : |
| **96 S. Grant Avenue** | : |
| **Columbus, OH 43215-4781** | : |
|  | : |
|  | : |
| **Defendant** | : |

Marino v. Board of Trustees of the Columbus Metropolitan Library Plaintiff Ingrid Marino and for this Complaint against Defendant Board Doc. 1
of Trustees of the Columbus Metropolitan Library alleges as follows upon information and belief
as to all matters:

 1. "Library" means the Columbus Metropolitan Library located at 96 S. Grant Avenue,
Columbus, OH 43215-4781.

 2. Plaintiff is a resident of Franklin County of Columbus, Ohio, and uses the Library
almost daily.

 3. Defendant serves as the regulating authority of the Library.

 4. "Letter" means the 17-page letter dated April 30, 2005, written by Plaintiff and
addressed and sent by certified mail, return receipt requested, to Patrick Losinski, Executive
Director of the Columbus Metropolitan Library (Losinski), with a copy to Susan Norris
Studebaker, Associate Director - Public Services of the Columbus Metropolitan Library

1

(Studebaker). The Letter was received by Losinski on May 4, 2005, and by Studebaker on May 5, 2005. Plaintiff's address block on the first page of the Letter sets forth her street and e-mail addresses and her telephone number.

## NATURE OF THE ACTION

5. The Letter sets forth a pattern of negligent and willful security failure by Defendant at the Library covering the period from February 15, 2001, through April 30, 2005, asks for redress for the injury thereby caused Plaintiff and states that failing relief Plaintiff will seek her remedies at law. Negotiation between Plaintiff and Defendant having failed, this action is being brought accordingly. Paragraphs 14 through 58 of this complaint make the same factual allegations as are made in the Letter, subject only to added clarifying statements of security guards being out of reach. Paragraphs 59 through 83 detail communication between Plaintiff and Defendant as well as action for which relief is being sought by Plaintiff, which have occurred subsequently to Defendant's receipt of the Letter.

## LIBRARY RULES OF BEHAVIOR, SECURITY

6. Until September 2004, rules and regulations governing customers' use of the Library were posted in only three (3) places: on the glass doors of the main, west, entrance and once each on the outer and inner north entrance glass doors. These were, and currently are, in both print and graphics: 1. No smoking 2. No loitering 3. Shoes and shirts must be worn 4. No guns. Beginning in September 2004, Library rules governing customer behavior in the Library were, and currently are, also posted in three (3) places beyond the check out gates, i.e. within the main Library halls: one (1) each sign on the main, second, and third floors. The signs are identical: framed, 18 inches high by 25 inches long, or 450 square inches, attached to the left, facing east, of the left elevator. The rules themselves occupy one third of the sign area: 8 inches by 18 inches, or 144 square inches, on the right. The coloring is subdued: black, blue and gray. To read them comfortably one needs to stand close to the wall where they are posted. Traffic to and from the elevators may pass this rule posting. On the main floor in front of the elevators are four club chairs, arranged in two pairs, back to back.

7. In the right-hand, 144-square-inch area of the 450-square-inch sign, twenty six (26) rules are listed under a heading saying that the listing is non-exclusive. One of the rules prohibits "Engaging in or soliciting a sexual act. Indecent exposure". Another prohibits unreasonable

noise, including loud talking. In final place is a rule that prohibits "Other acts disruptive to customers or staff". At the bottom of the list of rules there is the following statement: "Failure to comply with library rules after being asked by staff may result in police being called and a possible charge of criminal trespass per Section 2911.21 of the Ohio Revised Code." No appeal procedure is indicated, nor is any advice given as to how to proceed if made a victim of violation of the rules or of illegal acts.

8. The Customer Code of Conduct Policy, approved and effective 8/26/2004, states: "The library administration has the responsibility for maintaining order in the library and enforcing the established rules. The administration will maintain a Code of Conduct and ensure that the Code of Conduct is posted prominently in all library facilities and communicated to library customers behavior and procedures for in electronic and print formats...." A Code of Conduct print pamphlet sets forth the rules of behavior and procedures for enforcement and appeal. It states, among other things: "The rules for public behavior will be prominently posted in the Library. Library employees are authorized to bring to an individual's attention any act or omission which violates these rules. The individual will be asked to change the problem behavior to conform to the rules. If such change is not evident or forthcoming, that individual will be asked to leave Library property. Failure to leave if asked may result in the police being called and a possible charge of criminal trespass per Section 2911.21 of the Ohio Revised Code." No pamphlets are set out or otherwise offered to customers. The pamphlet fails to give guidance on procedures to follow for a victim of rule violations or illegal acts.

9. On June 11, 2004 (see also paragraph 35), in response to Plaintiff's question why loud cellphone talk by a customer on the stairway landing on the third floor was being allowed, a librarian stated that security staff would take no steps to enforce Library rules of behavior unless first asked to do so by a librarian who, in turn, would take no action unless and until asked to do so by a customer. She stated that this was library policy and guided by the desire to "keep everyone happy."

10. In Neinast v. Board of Trustees of the Columbus Metropolitan Library, 346 F3d 585, (Neinast) the defendant Board cited and won its case on the basis of incident reports documenting various hazards to health and safety of barefoot patrons. Twenty (20) incidents of hazardous conditions on the floor involving feces, urine, vomit, blood were cited. The 6th Circuit, affirming the district court's ruling in favor of defendant-appellee, using a rational basis test ruled that the library regulation prohibiting patrons' use of the library without shoes was valid because it furthered "the legitimate government interests of protecting public health and safety and protecting the Library's economic well-being by seeking to prevent tort claims brought by library patrons who were injured because they were barefoot."

11. Also in <u>Neinast</u> , in its motion for summary judgment filed 9/17/2001, the defendant Board stated the following: "The Library's facilities are visited by thousands of individual [*sic*] each day, none of them directly supervised by Library staff. The floors and hallways of Library facilities may hold any number of hazards. The Library and its employees cannot guarantee that facilities will be completely free of hazards created by other patrons, by the staff, or by the facility itself. The requirement that Library patrons wear shoes it without question a rational and reasonable means to effectuate the Library's interest in the safety of patrons and preventing injury. The same is true with respect to the Library's interest in protecting its fiscal integrity..."

12. In an interview on April 12, 2001, with Joe Blundo of the Columbus Dispatch in connection with <u>Neinast</u>, Forrest Sorensen, at all relevant times Defendant's Manager of Security Services (Sorensen), was quoted as saying that the barefoot ban was an "administrative interpretation of library board policy against disruptive behavior"... "We do have in our procedures that customers should not engage in actions that are distracting to other customers ... Sitting around with bare feet certainly does attract attention."

13.  In August 2005, the security guard Fred stated in response to Plaintiff's question why the prohibition of loitering was not being enforced in the northernmost section of the north entrance, i.e. on the stairs and in the area between the sliding doors, that the reason is the absence of coverage of the area by surveillance camera.

## PLAINTIFF TARGET OF ABUSE BY LIBRARY STAFF

14. On February 15, 2001,  Plaintiff was evicted from the Library by a security guard then only known to Plaintiff by sight but now known to her as "Fred".  Fred stated that Plaintiff's behavior had been noticed by a librarian and was unacceptable;  that Plaintiff  would have to leave, but would be allowed to come back the next day. He cited no rule of behavior allegedly violated by Plaintiff, nor did he specify why Plaintiff's behavior was deemed objectionable.  He entertained no discussion with Plaintiff when she tried to explain her behavior. The eviction was made immediately after Plaintiff, who was sitting reading facing west at a table close to the south wall, app. 10 yards from the librarians desk,  in the south-east corner of the seating area of  the biography/history/travel section on the 3rd floor of the Library,  motioned to a customer (Library name for visitor or patron) sitting at a table near the west wall and facing Plaintiff to stop his behavior:  he was staring at and gesturing to Plaintiff while rubbing his hand along his chest and stomach. There was no security guard within immediate reach, either by sight or voice.

4

15. On April 24, 2004, at about 8:35 a.m., Plaintiff was the only patron of the Javamaster cafe located near the north entrance of the Library. Plaintiff was the only person seated in the Javamaster seating area. There was no security guard in the cafe area or within immediate reach, either by sight or voice. Plaintiff was sitting at the southernmost table with a snack just purchased from Javamaster when a man (Other Customer) entered the cafe lobby from the main entrance lobby and immediately turned to the area immediately behind Plaintiff, showing interest in the printed matter displayed there on the ledge running along the wall directly and closely behind the cafe seating. The Other Customer passed within two inches distance by Plaintiff's left and Plaintiff noticed that he was wearing pants that as a result of being rolled several times in the waist fit so tightly that his genitals were clearly delineated in the fabric. Plaintiff asked the Other Customer to keep his distance and to please move away. The Other Customer then moved to the table at the opposite, the northern, end, turned south to face Plaintiff and proceeded to stare at her steadily. Plaintiff motioned and called to him to turn around and to stop staring.

16. Before long, a security guard whose name Plaintiff did not know at the time but who was later identified as Dwayne A. Wilson (Wilson) appeared in the Javamaster cafe area. Standing by the kiosk, he turned to Plaintiff and asked her what the trouble was. Plaintiff briefly explained, pointing out the Other Customer. Wilson turned to the Other Customer, who was still turned toward Plaintiff, staring at her, and ordered him to turn around.

17. Next, Wilson fixing Plaintiff with his eyes, thrust out one arm with the index finger pointing at Plaintiff and yelled: "Are you happy now?" His facial expression and overall body language were hostile, angry and menacing.

18. Then Wilson moved from the kiosk across the middle corridor to Plaintiff's seat and, standing in front of her table, ordered her to leave the library. He said nothing else.

19. Plaintiff did not leave but proceeded to purchase and have at her table another snack from Javamaster.

20. Wilson used his cellphone. The Other Customer went through the gates to the inside of the Library and returned to the cafe shortly thereafter. He sat down. He ordered no snack. He picked up a pamphlet from the ledge and kept looking up, casting glances at Wilson and Plaintiff.

21. After app. 10 minutes, two cops arrived on the scene and it was determined that Plaintiff was to be evicted. Plaintiff was not advised of her alleged wrongdoing. Her account of what had occurred was derided and dismissed.

22. Meanwhile, two or three security guards came to get refreshments from Javamaster. They stared at the scene behind them. They grinned and seemed excited.

5

23. Peter Garretson (Garretson) was the last guard to appear on the scene. When they saw him the cops, now in the process of determining the measure of Plaintiff's punishment, yelled to Garretson, standing by the Javamaster booth, whether Plaintiff had previously been involved in trouble at the Library. Garretson answered yes, there had been a prior incident.

24. Plaintiff's eviction from the Library and 7-day suspension of customer privileges was then set. Wilson issued to Plaintiff a paper titled "Eviction Notice" on which after the printed "Violation Type or Category No." he hand-printed in block letters "*17 BEHAVIOR DISTURBANCE" and signed: "Off. Dwayne A. Wilson". The eviction notice does not contain and Plaintiff was not otherwise advised of an appeals procedure. Plaintiff was escorted by the cops out of the Library. Plaintiff walked slowly, half limping. Plaintiff only the previous day had been the victim of a purse snatcher on a bike who, near the BP gas station on the corner of Broad Street and Monroe, coming from behind on the sidewalk knocked Plaintiff to the ground and took her coat, credit card and house and car keys. The fall caused severe trauma to Plaintiff's right hip and groin. Her limping caused one of the cops to ask her if she needed help and to advise her, when she briefly explained why she was limping, to seek out neighborhoods considered safer.

25. On October 1, 2004, Plaintiff was sitting reading on the main floor of the Library in the club chair east of the computer located against the north wall of the connector corridor leading from the main staircase to the fiction section. Plaintiff noticed two young, attractively attired female customers using the computer. Before long, Plaintiff saw a security guard ("Frolic"; actual name unknown; a black male, late twenties to early thirties; apparently no longer working at the Library) approaching through the corridor from the direction of the main entrance and making a beeline for the aforesaid computer. He had a broad smile on his face and began to speak to the two aforementioned customers flirtatiously, in a cooing tone and manner. They responded with giggling and laughter. He was not pursuing security guard duties. Plaintiff was disturbed and got up to sit somewhere else. In passing, she said to Frolic, quietly, "You are disturbing me".

26. On October 4, 2004 at app. 1:00 p.m., Plaintiff was approaching the Library north entrance on foot. Frolic was standing just outside the entrance. There was another man to his right. Frolic was looking directly into Plaintiff's eyes as she was approaching. He kept staring at Plaintiff, never averting his eyes. Plaintiff, in passing and upon entering the Library building, said to him: "Please do not stare at me". The other man shouted: "He didn't do nothing", or words to that effect. Plaintiff did not respond but simply entered the building.

6

27.  A little later, at app. 1:15 p.m. on the same day, October 4, 2004,  Plaintiff was sitting reading in the main seating area of the north section on the 3rd floor of the Library. Frolic and another security guard, a male, approached, ordered Plaintiff to get up and go with them. They forced Plaintiff to go to the security desk on the first floor. Behind the security desk was Garretson. Only his head was visible. Garretson said to Plaintiff, his face and voice full of anger: "You are harassing us". When Plaintiff tried to respond, Garretson ordered Plaintiff to be quiet. Casting furtive glances toward the human resource office door,  he said that he did not want to attract attention and that if Plaintiff was not quiet, he would call the police and have her evicted. Plaintiff left the Library immediately thereafter.

## OTHER SECURITY FAILURES

28.  On April 1, 2004, a robbery occurred at the Library store. It was not noticed by the guards. The surveillance camera tape which would have shown the crime was lost

29.  On May 25, 2004, at app.7:30 p.m., a  group of loud and rowdy youngsters occupied Javamaster seating. They were not paying guests. Security did nothing.

30.  On May 25, 2004, at app. 8:00 p.m., Javamaster was robbed by a patron. Apparently he waited for the Javamaster attendant to use the restroom. When she did, he entered the Javamaster booth and stole the money bag. The robbery was not noticed by the guard then on duty at the security desk in the main lobby..

31.  On May 28, 2004, at app. 10 a.m., three security guards were behind the security desk on the main floor. They were chatting, grinning, laughing.

32.  On or about May 28, 2004, on the third floor a security guard was leaning against the staircase balustrade while chatting with a customer sitting in the seating nook opposite the staircase, then designated for and the only space in the Library permitting cellphone use (cellphone corner).

33.  On June 4, 2004, at 5:45 a.m., a security guard was engaged in a very loud personal conversation with a librarian at the 2nd floor librarians' desk.

34.  On June 9, 2004, from app.11:00 a.m. to 1:00 p.m., on the 3rd floor in the newspaper/magazine area a loud, cantankerous conversation was going on between two male customers, one in front of a computer not far from the librarians' desk apparently doing some work on it, the other standing next to him. They were raising their voices. The person standing

7

kept moving back and forth and pivoting. No one intervened. Upon leaving at app. 1:00 p.m., Plaintiff asked the librarian at the desk, close to where the loud conversation had taken place, why no one asked these two people to be quiet? She said she hadn't heard anyone talking.

35. On June 11, 2004, at about 9:15 a.m., Plaintiff was on the 3rd floor of the Library, in the center not far from the librarians' desk, when she heard a man talking loudly. He was talking into a cellphone while leaning over the railing of the stairwell opposite the cellphone corner. He was gesticulating and, for at least five minutes, his voice was penetrating far and wide in the Library. Meanwhile the librarian, a woman, was engaged in what appeared to be a social chat with Eric, a Library security guard. Their chat was far from subdued and it disturbed Plaintiff in addition to the loud cellphone talk. Neither the librarian nor Eric seemed to notice the cellphone noise, although common knowledge indicates that they could not help but notice it. Plaintiff asked the librarian why the loud cellphone talk was being allowed to go on. She responded that security would take no steps to enforce Library rules unless first asked to do so by a librarian who, in turn, would not act unless and until asked to do so by a customer. Plaintiff asked why the burden of enforcing Library rules should thus be placed on the customer. Her answer: because the goal is to keep everyone happy. Eric did at that point go over to the cellphone talker who then took a seat in the cellphone corner.

36. In November 2004, Plaintiff was sitting in the glass cubicle at the south end of the geography/biography section of the Library on the third floor. Plaintiff was facing south. Suddenly she noticed a young male individual within just a step's distance in the narrow aisle between the cube and the window. He was working a carpet sweeper. He abruptly stopped, looked Plaintiff in the eyes and asked: "Do you have a cigarette?" Plaintiff said: "You must leave", and he did. Plaintiff immediately notified the librarian at the librarians' desk. The librarian seemed greatly displeased, scowled and said to Plaintiff: "Well, go tell security." There was no security guard in sight.

37. On January 10, 2005, Plaintiff saw a patron lying prostrate across two chairs in the north glass cubicle on the 3rd floor. Garretson, who was patrolling the area, didn't seem to notice and left the customer undisturbed in this position.

38. On January 19, 2005, at 2:00 p.m., a group of people was lingering at the foot of the steps in the north lobby.

39. On January 26, 2005 at 1:30 p.m., in the geography/biology section on the 3rd floor, Plaintiff was near the librarians' desk for about 15 minutes, looking at a Farah Diba book on display. Plaintiff had gone there after leaving her seat on the north side of the 3rd floor because she was disturbed by very loud talk of a group of young men about private matters, verging on

8

the lewd. Very loud talk of a private nature was also going on between a customer and a librarian at the geography/biology librarians' desk. There was no security personnel in sight anywhere. But on her way out, shortly thereafter, Plaintiff observed three security guards standing behind the security desk engaged in loud talk, apparently on private, certainly not library-security matters. It looked as if they are taking a break together.

40. On January 29, 2005 at 4:00 p.m., on the third floor stair landing three male customers were engaged in a loud conversation for about 10 minutes. They were chatting about private matters. Their loud talk disturbed Plaintiff at a computer in the east section of this floor. There was no security guard in sight and no one intervened to stop the loud talk.

41. On January 31, 2005 at 11:30 a.m., the Javamaster attendant was threatened by aggressive word and manner of a person insisting on being served. There was a guard at the security desk at the time. He was engaged in conversation with a women standing in front of his desk and did not intervene.

42. On February 1, 2005 at app. 6:00 p.m., on her way out of the north entrance of the Library Plaintiff saw three adolescents, two male, one female, standing in the space between the two automatic sliding doors. They were chatting and giggling. Plaintiff smelled smoke of some sort. When Plaintiff exited through the outer door, the female preceded her, smoking.

43. On February 8, 2005, entering the Library at app. 4:00 p.m. through the north entrance Plaintiff saw a young man by the payphone at the cafe, sitting on the ledge of the telephone wall mount with his feet on a cafe chair which he had pulled toward himself. Passing through, Plaintiff saw noone intervene.

44. On February 9, 2005, at 5:00 p.m., Plaintiff entered the Library through the north entrance. In the lobby, a security guard was ushering out a recalcitrant customer carrying a huge plastic bag. Meanwhile, another customer was sitting on the west stair railing, under the shop window, dangling her legs into the staircase. The security guard appeared not to notice her, either on his way out or on his way back in.

45. On February 10, 2005, at 5:45 p.m., a security guard, he is very stout, was leaning on the 3rd floor center librarians desk talking at the librarian. His back was turned to the seating area, with the right, weight-bearing, leg close to the desk, the left stretched backward. The conversation was of a personal nature.

9

46. On February 10, 2005, at app. 5:50 p.m., a security guard was chatting with a young male patron in a white sweater with red stripes and a badge on a strap around his neck who was leaning over the staircase railing on the 3rd floor in front of the elevators talking into a cellphone while rubbing his bare stomach, having moved his sweater above his waistline. The guard was asking him about his duties, how things were going.

47. On February 20, 2005, at 4:30 p.m., Plaintiff was sitting at a table on the second floor in an area within the art section, which has tables on one side, book stacks on the opposite, the east, side. Plaintiff was at about the 6th table down from the general area where the librarians' desk is, and 3 tables up, i.e. west, from the book stacks. Plaintiff was looking at prints in books on E. Hopper. Suddenly Plaintiff was alerted by somebody making an entry into this seating area and raised her head. From the right, along the south aisle of this subsection, there approached a youngish, late 20s to early 40, black male. Plaintiff noticed him particularly for the scowling, angry expression on his face. He moved with a forceful strut, taking long strides, almost barreling through the tables. He spent a brief moment in the stacks, then reemerged, cutting through the seating aggressively full throttle as before, now using the middle aisle, which has tables on both sides and runs immediately past the chair on which Plaintiff was sitting. This aisle is narrower than the south one he used coming in and more difficult to navigate. He kept moving aggressively and with such speed and force that Plaintiff was afraid he would ram, if not attack her. He did not move as a reasonable person would expect another reasonable person to move in such close quarters, in which people are invited to pursue studies and drink at the "fons eruditionis", the Library's words on its building. When Plaintiff saw him bearing down on her so hard, she felt threatened, and fear welling up in her made her instinctively half rise out of her chair, in a flight reflex, and stand leaning away, her face contorting, her mouth open, and *sotto voce* scream "help". There was no security guard within reach.

48. On March 1, 2005, at 9:40 a.m., the security guard called Eric was at the third floor center librarians desk talking loudly with a librarian. Later, at about 10:30 a.m., Eric was standing just outside the checkpoint gates with Lou, the checkout clerk, chatting loudly. The security desk appeared unoccupied to Plaintiff exiting through the north entrance.

49. On March 2, 2005, in the a.m., on the 3rd floor in the economy section Plaintiff was twice disturbed and made uncomfortable with no help in sight: a man at the table behind her soon started sighing and making other intimate noises; in the north glass cubicle to which Plaintiff fled and sat in the chair at the very northernmost extension of the big round table with which the cubicle was then furnished, turned north, i.e. facing out, she was after no more than 10 minutes joined by a male person who sat down at this round table not far from her. His body language showed aggression. He had no book or other reading material with him. There was no security guard within reach.

10

50. On March 2, 2005 at 6:00 p.m., the security desk was unoccupied. In an apparent shift change, Wilson was in the Library store on the main floor, holding forth in a loud voice to the sales person, a woman, about his private affairs, such as schools, teachers, administration. At 6:10 p.m. Wilson returned to the security desk now occupied by Garretson and Fred. There was no security cover from 6:00 to 6:10 p.m.

51. On March 4, 2005, at 4:30 p.m., on the third floor in the cellphone corner a woman was sitting on the rug, leaning her back against the legs of a man sitting in the front chair. They were clearing having a cozy moment. They were speaking to each other, the man holding the woman's hand with one hand and playing with the rug, lifting up the back corner, with the other. No one stopped them.

52. On March 24, 2005, Plaintiff, sitting reading on the ground floor in a club chair facing west and located directly in front of the elevators, suddenly felt a thud directly behind her, making her chair rock: a customer had exited the elevator and thrown some of his belongings into the chair placed flush against Plaintiff's chair, but facing opposite, i.e. the elevators behind her. This alarmed Plaintiff and made her move. She couldn't help sending off a scowl in the direction of the rude customer who had caused the disturbance. There was no security guard within reach.

53. On March 24, 2005, Plaintiff was sitting reading in a club chair in the connector corridor between the first floor main hall and the fiction section. She was keeping her face largely covered with a scarf, for privacy. When she looked up, Plaintiff saw a man staring at her. He was sitting in a club chair facing the elevators and appeared otherwise unoccupied. Disgusted, Plaintiff gestured her displeasure, throwing up her hands and left the Library. There was no security personnel within reach. No guard was patrolling the floor.

54. On April 8, 2005, from 9:00 a.m. to at least 9:20 a.m., a woman standing on the stairs in the north lobby was using a cellphone and taking notes on papers she had spread on the ledge under the shop windows on the west side of the stairs. A large, very lively high school class entered while a group of children was leaving. The high school students bought refreshments. Some of them sat down, some remained standing. The security guard Sam after a while stood at the entrance, at the bottom of the stairs. He did not seem to notice the woman, allowing her cellphone and paperwork activity on the stairs to proceed.

55. On April 24, 2005, a customer at a 3rd floor computer was chomping a sandwich he was holding over the keyboard. No one intervened.

11

56. On April 27, 2005, on the 3rd floor in the large seating area with club chairs, Plaintiff was in the front chair of the first group of two chairs, reading. A tall grinning chap swinging a small plastic bag in his left hand came walking by with much energy, circled both seats, and, returning, brushed up hard against Plaintiff's chair. Feeling threatened, Plaintiff left her seat. There was no guard within reach.

57. In the north lobby children will often play by riding down the railings as in an amusement park, straddling both, feet forward. People will stand in the window corners, chatting, waiting. People will stand or sit on the stairs. Security officers will not intervene.

58. A Library staff member, an older man, at one time sneaked up to Plaintiff in the book stacks and groped the back of her neck from behind. Stunned and frozen, Plaintiff did nothing, although she felt like screaming. There was no security guard within reach.

## May - October 2005

59. After a second mailing by Plaintiff, on May 11, 2005, by regular mail, of the Letter to Studebaker, asking for a response, and a message asking the same left on her telephone tape on May 15, 2005, Studebaker, either by telephone message or in a live telephone conversation, assured Plaintiff that Sorensen had been attempting but was unable to get in touch with Plaintiff by telephone. Studebaker assured Plaintiff that Sorensen wanted to speak with Plaintiff.

60. On May 16, 2005, at 5:53 p.m., Plaintiff received an e-mail message from Sorensen saying "Mr. Losinski shared your concerns about the Library Security staff with me. I would be happy to arrange a time to discuss these with you an[d] see if it's possible to resolve them. Please contact me. My telephone numbers are listed below. Thank you." There follows a listing of his telephone, cellphone and fax numbers and e-mail address.

61 A telephone conference between Plaintiff and Sorensen took place on May 17, 2005 at 4:00 p.m. Sorensen opened by asking what Defendant could do to address Plaintiff's concerns. Plaintiff answered she wanted compensatory damages, as indicated in the Letter. Sorensen asked: "Money?", to which Plaintiff responded yes, that was the gravamen of the relief demanded and that, in addition, the Library would need to bring its security policies and practices in line with the law. Sorensen responded that he would have to discuss these points with the decision makers of the Library before any action could be taken.

12

62. A meeting in person at Sorensen's Library office was arranged by Plaintiff and Sorensen by phone and e-mail for May 23, 2005 at 9:30 a.m. In an e-mail message sent by Sorensen to Plaintiff on May 19, 2005, Sorensen said: "I spend much of my time at our branches" (as opposed to the Main Library).

63. The meeting took place at Sorensen's office at the Library on May 23, 2005, at 9:40 a.m. - Throughout the meeting, Sorensen addressed Plaintiff by her first name only, without asking permission from Plaintiff. Sorensen opened by asking what Defendant could do to give Plaintiff comfort regarding the issues raised in the Letter. He indicated he wanted to concentrate on security guard issues.

64. Plaintiff stated that, in addition to her demand for damages, previously stated, she was asking for relief through change in security personnel. She would not be comfortable at the Library with either Garretson or the Guard (Plaintiff's moniker for Wilson in the Letter and prior to learning his name from a librarian she consulted after the 5/23 meeting) still working at the Library. In addition, Defendant should abide by the law.

65. Sorensen took notes, murmuring "abide by law". He next asked whether Plaintiff could identify the Guard further. Plaintiff repeated her description from the Letter: "Black, tall, grizzled hair". Plaintiff asked Sorensen whether Garretson had been fired. Sorensen responded, with a smile, that under the circumstances he was unable to answer the question. Sorensen asked if Plaintiff had hired a lawyer yet. Plaintiff replied that she would be acting as her own attorney.

66. Plaintiff stated her belief that she is entitled to money damages for the harm done to her by Defendant, through its security staff and general security failure. Sorensen responded by asking: "How much?" Plaintiff responded: "1/2 million $." Sorensen asked by what date Plaintiff would need an answer and Plaintiff responded: "By the middle of the following month", i.e. June 15, 2005.

67. On June 17, 2005, at 7:26 a.m., Plaintiff sent a follow-up e-mail reminder of the June 15 deadline to Sorensen. It was answered by Sorensen at 12:12 p.m. on the same day by the following e-mail message: "Ingrid, Your complaints were reviewed and referred to the appropriate authorities. At this time, we do not intend to take further action. Thanks...".

68. In a letter dated June 27, 2005 Plaintiff summarized the communication between Plaintiff and Defendant covering the period from receipt of the Letter by Losinski and Studebaker, May 4 and 5, respectively, through June 27, 2005. This letter was sent by certified mail individually to Defendant, Losinski, Sorensen and Studebaker and was received by each on June 29, 05. Plaintiff has not received an answer to this June 27, 2005 letter.

69. Subsequently to the May 23 meeting with Sorensen Plaintiff on her nearly daily visits to the Library would see Wilson there in his capacity as a Library security guard. Wilson would fix Plaintiff with a scowl and unrelenting stare from behind the security desk. Plaintiff would avoid his stare.

70. On July 13, 2005 Plaintiff sent, by regular mail, a letter dated July 11, 2005 addressed to Sorensen, with copies to Losinski and Defendant, expressing her disappointment with Wilson still doing security service at the Library. Enclosed with each copy sent was a photocopy of the Eviction Notice dated April 24, 2004. In this letter Plaintiff questions why Sorensen in the May 23, 2005 meeting with Plaintiff purported to be unaware of the Guard's, i.e. Wilson's, identity. Further, Plaintiff encourages Defendant to seek prosecutorial evaluation, similar to its procedure in the barefoot dispute decided in Neinast, of the legality of its rule "#17 Behavior Disturbance" as well as of the current rule prohibiting "Other acts disruptive to customers or staff". Plaintiff expresses her overall opinion with the words: "Shame on you". Plaintiff has received no answer to this letter.

71. On July 23, 2005, at app. 9:05 a.m., Plaintiff used a copier on the third floor of the Library to make a total of six (6) copies of select pages of a book which she had previously borrowed from the Library and had brought with her from her home for the purpose of making the copies. The book was John Updike's "Roger's Version" and the copies were: 1. Front of jacket (1 copy) 2. Back of jacket (1 copy) 3. pp. 10/11 (2 copies) 4. pp. 14/15 (1 copy) 5. pp. 20/21 (1 copy). Immediately after making the copies, Plaintiff returned to the north entrance area on the first floor. Looking back on her way, she observed a security guard who apparently just joined the Library security force. His name is unknown to Plaintiff and he will be referred to as "Newt" for this Complaint. Newt was standing behind the security desk engaged in conversation with someone inside the desk where the security monitor is located, and invisible to Plaintiff.

72. Plaintiff stopped off at the Javamaster kiosk in the north lobby, briefly spoke with the attendant, Stephanie, and handed her one (1) of the copies she had just made, leaving Plaintiff with a total of five (5) sheets of paper in her hand. Plaintiff frequently engages in conversation with Javamaster personnel. No sooner had Plaintiff handed the copy to Stephanie than she was approached by Newt emerging from the security desk. He stood next to Plaintiff, asked for a cup of ice from Stephanie and said to Plaintiff that if Plaintiff intended to make a distribution of materials, she would first have to get permission to do so. Newt's manner was brusque to hostile. He then proceeded toward the elevators in this north lobby.

73 Plaintiff went to the security desk to ask for Newt's name. At the security desk was Wilson. He stood up, fingering his belt with both hands. Wilson said that he would not tell Plaintiff Newt's name. Plaintiff, for verification and accuracy's sake, then asked Wilson for his

name. Wilson said accusingly: "You know my name, and you've been asking around for names lately." Plaintiff, intending to make clear to Wilson the reason for her desire to know Newt's name, proceeded to relate Newt's behavior, his having approached Plaintiff and told her that the Library requires prior authorization for distribution of materials to or addressing the public at large within Library premises. Wilson said: "Yeah, that's right".

74.  Plaintiff then turned to the checkout gate attendant, Pete, and asked him if he knew Newt's name. He did not know. Meanwhile, Wilson had taken position by the checkout gate, standing, legs apart, surveying Plaintiff, keeping both hands at his waist line fingering his belt Plaintiff immediately left the Library.

75.  Plaintiff  complained about the incident described in paragraphs 71 through 74 hereof in an e-mail message addressed to Sorensen, Losinski and Studebaker and sent to each of them individually online on July 23.  Plaintiff characterized Wilson's and Newt's action as harassment, abusive and in bad faith. Plaintiff also, on July 25, sent a photocopy of this e-mail message by regular mail to Defendant, with a handwritten note thereon specifying the pages of "Roger's Version" copied by Plaintiff and the total of copies made, and enclosing a duplicate of these copies, except that only one (1) copy of page 10/11, of which Plaintiff had made two (2) copies, was enclosed. Plaintiff has received no response other than silence to any of these mailings.

76.  On August 8, 2005, Plaintiff sent a message by regular mail to each of the following, individually, at the Columbus Metropolitan Library: each member of the Board of Trustees; Losinski; Sorensen; and Studebaker. The message is sarcastic. "Poor Forrest was in a forest", it begins, poking fun at Sorensen's purported ignorance of the identity of the guard named "the Guard" in the Letter and whose name is printed on the April 24, 2004 Eviction Notice. Plaintiff enclosed a copy of the Eviction Notice and thereon and on an additional page hand drawn cartoons of Wilson pointing his index finger and of him bending over a librarian's desk, something he could frequently be observed doing, with the legends: "Are you happy now?" and "Officer at Work". It also questions the mental powers or mindset permitting flagrantly unconstitutional rules not only to be posted, but also enforced at the Library and again urges the Library to verify with the prosecutor's office, as it did when Robert A. Neinast questioned the barefoot rule, the constitutionality of its rule  "17 Behavior Disturbance" and the current "Other acts disruptive to customers [or] staff". Plaintiff has received no response other than silence to this mailing.

77.  Plaintiff, who uses the Library almost daily, has not seen Garretson there since app. mid-May 2005.

15

78. On September 2, 2005, at app. 10:45 a.m., Plaintiff saw Wilson in uniform at the Library after not seeing him there for two weeks. He was behind the security desk, emerging from the back room behind it, and engaged in a friendly exchange with Fred. At app.10:55 a.m. Plaintiff saw Wilson taking a walk in the north courtyard. Plaintiff turned to him saying "Good morning, Mr. Wilson". Wilson turned his head to his right, deliberately ignoring Plaintiff. Plaintiff, proceeding to cross Library Park, called back to Wilson, within his hearing: "You should not be working here. You are a lawless person."

79. On September 4, 2005 Plaintiff sent an e-mail message to Sorensen, with e-mail copies to Losinski and Studebaker, asking for help in avoiding Wilson at the Library by letting her know his schedule and also, in reference to the incident described in the foregoing paragraph, offering her apology for "losing my temper". Plaintiff received no answer to this message.

80. On September 27, 2005, at about 11:30 a.m., Plaintiff intended to make photocopies of the Eviction Notice enhanced by Plaintiff with comic graphics depicting Wilson in various poses Plaintiff had observed him in while pursuing his Library Security Guard activities, including his pointing at finger at Plaintiff on April 24, 2004, sneering and asking: "Are you happy now?". Seeing Wilson behind a checkout gate, Plaintiff showed him the original explaining she intended to make some copies which she did not intend to distribute at the Library. Plaintiff asked Wilson whether he would allow Plaintiff to make the copies. Wilson did not respond. Wilson avoided Plaintiff's eyes. Plaintiff, shaking her head and saying out loud: "Why are you still working at the Library?", then proceeded to make the copies.

81. On or about September 28, 2005, Plaintiff, by regular mail, sent a letter dated September 27, 2005 to the Defendant Board of Trustees, Losinski, Sorensen, and Studebaker describing the incident set forth in paragraph 78, above, and apologizing for her behavior and also requesting permission to distribute at the Library copies of the Eviction Notice including the graphics.

82. On October 05, 2005, Plaintiff received a letter dated October 3, 2005 from the Library, signed by Sorensen. The letter acknowledges receipt of Plaintiff's September 27, 2005 letter. It then states: "I was also informed that you had a similar encounter with Off. Wilson on September 2, 2005." It proceeds to characterize Plaintiff's actions in those incidents as "harassment" and "a violation of our Code of Conduct" and further states that failure by Plaintiff to cease "all future conversation with Off. Wilson will result in eviction from the library. If you need assistance please contact another library associate. "

83. This October 3, 2005, letter from Sorensen is the only response to Plaintiff's mailings to the Library that Plaintiff has received from the Library since Sorensen's 6/17/05 e-mail stating that the Library "at this time" does not intend to "take further action. Thanks...".

16

84. On January 3, 2006, in the afternoon, upon leaving the Library through the north entrance, Plaintiff, turning her head back toward the security desk, saw Wilson staring at her from behind, with a smirk on his face.

## SOLE CAUSE OF ACTION
## (BREACH OF DUTY)

85. Plaintiff re-alleges paragraphs 1 through 84 as if fully set forth herein.

86. Plaintiff has the right under the First Amendment to the United States Constitution to receive information and ideas at the Library in a safe and sanitary environment.

87. Defendant has the duty under the First Amendment to the United States Constitution to provide information and ideas to Plaintiff in a safe and sanitary environment.

88. Defendant is aware of hazards posed in its facilities. In successfully arguing in Neinast for its rule requiring footwear, it stated that it cannot guarantee that its facilities "will be completely free of hazards created by other patrons, by staff or by the facility itself."

89. While Defendant cannot guarantee complete safety in its facilities, it nevertheless has the duty to ensure safety. To meet this duty, Defendant may, among other things, give notice of and enforce appropriate rules and regulations governing customer behavior. Such rules and regulations must be constitutional.

90. Plaintiff has the right to use reasonable self-help to protect herself when endangered. This is a fundamental, common-law and constitutional right. It cannot be traded for the right to receive information.

91. Defendant violated Plaintiff's rights and breached its duty to Plaintiff, with torts and other wrongdoing, as follows:

A. Wilson evicted Plaintiff using a rule "#17 Behavior Disturbance". This rule is unconstitutional and void on its face because it is vague and overly broad. The same is true of the rule which seems to have replaced it, prohibiting "Other acts disruptive to customers or staff." Therefore, Plaintiff's eviction by Wilson using rule #17 was wrongful.

17

B. Wilson did not give Plaintiff notice of how her behavior was improper and an opportunity to correct it. Instead, Wilson's overall behavior, including his pointing a finger at Plaintiff and sneering: "Are you happy now?", after initially ordering her assailant to turn around, shows malevolence and bad faith fueled by personal animus. It was a sinister practical joke worthy of a tyrant and a dictator and constituted an assault on Plaintiff. Wilson was bent on punishing Plaintiff for having dared to protect herself.

C. The sudden convergence at the cafe of other members of the exclusively male Library security force and their gawking, taking in the scene and grinning, was gross dereliction of duty by Defendant. It was deeply humiliating to Plaintiff who was made to feel as if she were a condemned criminal tied to the stake and offered to the public for viewing before execution.

D. Wilson continued his sick and sinister practical joke when he ordered Newt to warn Plaintiff about potential violation of the rule against distribution of unauthorized material. This act by Wilson was malicious and in bad-faith. Plaintiff's handing a single photocopy to Stephanie could not in good faith be seen as "distributing/posting unauthorized materials." Wilson knew that Plaintiff often engages in friendly chats with Javamaster personnel. Plaintiff was not standing in the middle of customer traffic offering handouts. This action by Wilson was particularly and abjectly heinous because he used a newcomer to do his wrongful bidding for him, who was clearly made uncomfortable by it. It was a sham Wilson hit upon solely for the purpose of annoying and humiliating Plaintiff. It came <u>after</u> Sorensen's ostensibly good-faith negotiations with Plaintiff to address her security "concerns", and was a vindictive ploy. It was intentional infliction of emotional distress.

E. Intentional infliction of emotional distress and menacing were torts and wrongdoing also committed by Wilson when Plaintiff sought to address with him Newt's action: his response "Yeah, that's right", in other words, Newt acted lawfully; his refusing to give Plaintiff Newt's name or verifying his own name; his rising menacingly to full height, towering above Plaintiff, boosted by the high-rise security desk, fingering his belt, scowling and glaring; his pursuing Plaintiff to the checkout gate when she sought the information from Pete, the gatekeeper, and standing there menacingly, legs apart, fingering his belt, glaring.

F. Wilson harassed and menaced Plaintiff by repeated hostile glaring directly at her from behind the security desk as she entered or exited the ground floor foyer.

G. Defendant, by Wilson, punished Plaintiff for, in good faith, taking reasonable steps to protect herself against a hazard within the Library.

18

H. Defendant, by Garretson, punished Plaintiff for, in good faith, taking reasonable steps to protect herself against hazards within the Library. Garretson, after having Plaintiff detained by two security guards forcing her to go, from where she was sitting quietly reading, to the security desk, subjected Plaintiff to humiliating verbal censure accusing her, without explanation, of "harassing us". His action was probably driven by Plaintiff's having asked Frolic to please stop glaring directly at her as she was approaching the north entrance, as well as, prior to that, politely informing him that he was disturbing her quiet reading pleasure by loud, sexually charged chatter with female customers immediately next to her. Garretson's words: "You are harassing us" show a conspiratorial, band-of-brothers mind-set, where the customer is the enemy who needs to be taught a lesson. It epitomizes a general abdication of responsibility by Defendant and shows that, in Garretson's mind, wrongdoing by security guards could count on protection by their supervisors and would go unpunished. These acts by Defendant make it guilty of negligence, wrongful imprisonment and assault.

I. Defendant also, by Fred after he was called in by a librarian, punished Plaintiff with eviction for her reasonable, good-faith act of self protection against a hazard within the Library. Fred did not explain or offer Plaintiff a chance to correct her allegedly improper behavior. Fred's and the librarian's action was probably driven by Plaintiff's motioning in rejection to a customer making sexual overtures. Defendant, having received actual present notice of a customer violating the rule prohibiting "engaging in or soliciting any sexual act" knew no better than to evict the victim, Plaintiff. In doing so, Defendant in effect made common cause with the molester.

J. Defendant failed in its duty to maintain order in the Library by not prominently posting rules of behavior, coupled with failure to enforce them. Within the main halls, the exclusive posting on each floor off to the side of the north elevator is both inconspicuous and places the would-be reader directly in the line of traffic and in danger of becoming a traffic obstacle. It thus does not invite reading, let alone study of the rules, but rather discourages it and makes, at best, for no more than a blip on the radar screen of customers seeking their destination at the Library. The rules on the glass entrance doors, while prominent, are limited to few and are conspicuous for the absence of a rule prohibiting sexual harassment.

K. The absence of a surveillance camera by the north entrance creates a security vacuum.

L. Defendant's policy of making enforcement of rules of behavior dependent upon an alert by a librarian, who, in turn, will not act unless he or she receives a customer complaint, constitutes a breach of its duty. It unlawfully shifts the burden of maintaining order to the customer, the party who is owed maintenance of order. Even this policy was not followed when a librarian refused to help Plaintiff who alerted her and asked for protection when accosted by a maintenance worker.

19

M. By in effect hiding the rules of behavior and coupling this with shifting the burden of enforcement to customers, while security guards congregate and chat, Defendant has created a laissez-faire climate in the Library where quick fixes to maintain hush-hush surface quiet regardless of constitutional constraints are overriding policy. It is an environment where molesters can feel free to molest, knowing that not they but their victim will be punished if she protests. It is a place where wrongdoers can feel safe, where security guards feel free to join in the violation of a customer's rights, congregating and gaping alongside the molester, as she is rounded up, detained, and punished, kicked out.

N. Defendant's dealing with Plaintiff's complaint by in the end simply ignoring her shows more than indifference, it shows mockery and contempt. Sorensen's smug comment in an interview about Neinast with the Columbus Dispatch, cited in par. 12 herein, shows that he feels that the magic of "policies and procedures" will allow Defendant to proceed as it sees fit, free of legal, constitutional constraints. It seems that he did not or chose not to understand the actual holding of that case, which was to uphold as constitutional the barefoot policy, not a vague prohibition of "disruptive behavior".

O. Defendant ignored Plaintiff's repeated written complaints and request to explain the constitutionality of Defendant's action. When Defendant finally did respond, it was only to in effect endorse Wilson in his wrongful acts, thereby compounding Defendant's breach of duty and wrongdoing and clearly showing the willfulness thereof. Defendant ignored Plaintiff and made no move until it felt it was safe to go on the offensive and accuse Plaintiff. The charge: the ever serviceable, flexible, beloved coverall "harassment". Plaintiff, of course, did not harass Wilson. Having been repeatedly abused and assaulted by Wilson and, despite notice thereof to Defendant, wholly abandoned by Defendant in her quest for her rights, she felt even more threatened by and afraid of Wilson and chose reasonable means to protect herself. Sorensen's advice to Plaintiff to "contact another library associate...if you need assistance" is cynical and an insult.

91. Plaintiff's safety at the Library was and continues to be compromised. She was deeply emotionally injured by Defendant's wholesale betrayal of her in committing multiple negligent and willful breaches of its duty. She cannot feel protected at the Library, free to "experience the joy and satisfaction of learning and enrichment" promised and owed her by Defendant. She feels abandoned and threatened. The source of information and joy has as a result of Defendant's wrongdoing been poisoned for her and become a source of fear, taking a heavy emotional toll on Plaintiff. She has been made a victim two-fold: of Library customers violating legitimate rules coupled with Library security personnel failing to enforce them and manifold violations of Defendant's rules by Library staff. Plaintiff has been humiliated and psychologically tortured by Defendant and grievously injured emotionally. Plaintiff is living with an untreated wound, as though it happened yesterday, and seeing Wilson reignites the trauma.

92. Defendant, by asking Plaintiff twice, on two separate occasions, for her desired relief and without questioning any of the factual allegations of the Letter, and by failing to respond to her subsequent written complaint of additional wrongdoing is estopped to deny the corresponding factual allegations of this complaint or liability to Plaintiff arising from them. Defendant has compounded its malfeasance by, among other things, continuing to employ Wilson, giving him the opportunity to continue to abuse Plaintiff by subjecting her to malicious, torturous and tortious acts.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor, and against Defendant, as follows:

Defendant is liable to Plaintiff

I. for damages to compensate Plaintiff for injury for $50,000.-- and
II. because of the unabating and escalating willful, wanton, and intentional nature of Defendant's conduct, for exemplary and punitive damages of $150,000.--,

or such amount as the Court shall decide and such other and further relief, including interest, costs, disbursements and attorneys' fees incurred herein, as permitted by law.

Respectfully submitted

Ingrid Marino
Plaintiff, pro se
629 Oak Street #B
Columbus, OH 43215-3910
Phone (614) 224-2839
e-mail: ingridmarino@yahoo.com